IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:15-CR-103-FL-1

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | MEMORANDUM AND |
| | ) | RECOMMENDATION |
| RODRIGO BUSTAMANTE-MARTINEZ, | ) | |
| | ) | |
| Defendant. | ) | |

This matter comes before the court to address the motions by Defendant Rodrigo Bustamante-Martinez ("Defendant") to suppress all evidence seized from Defendant's residence in Nash County, North Carolina on April 14, 2013, including but not limited to firearms and ammunition [DE-36] and all custodial statements made by Defendant on that date [DE-35]; and Defendant's Objection to the Government's Notice of Intent to Offer into Evidence Absence of a Public Record [DE-33]. The Government filed responses in opposition [DE-38, -39, -42], and the undersigned held an evidentiary hearing on March 8, 2016, to further develop the record. Hr'g Tr. [DE-56]. Following the evidentiary hearing, the Government filed a supplemental response in opposition to the motions to suppress [DE-57], and Defendant filed a supplemental brief in support of the motions to suppress [DE-61]. Accordingly, this matter is ripe for review. For the reasons stated below, Defendant's Objection is moot, and it is recommended that Defendant's motions to suppress be denied.

## I. PROCEDURAL BACKGROUND

On April 8, 2015, a Grand Jury sitting in the Eastern District of North Carolina charged Defendant by Indictment with one count of being an illegal and unlawful alien in possession of firearms in violation of 18 U.S.C. §§ 922(g)(5)(A) and 924(a)(2). [DE-1]. Defendant was arraigned

on October 27, 2015, and entered a plea of Not Guilty. [DE-23]. Defendant's trial date has been continued and will be reset after resolution of the instant motions. Feb. 12, 2016 Text Order.

The court held a suppression hearing on March 8, 2016. Defendant did not present any evidence at the suppression hearing. The Government presented the testimony of six witnesses: (1) Deputy Jeffrey Marshmon ("Deputy Marshmon") of the Nash County Sheriff's Office, who responded to three calls for service at Defendant's residence on the night of April 14, 2013; (2) Dispatcher Jerry Belcher ("Dispatcher Belcher") of the Nash County 911 Center, who received a 911 phone call from Defendant's daughter in the early morning hours of April 14, 2013; (3) Deputy Adam Gelo ("Deputy Gelo"), formerly of the Nash County Sheriff's Office, who responded to the second and third calls at Defendant's residence on April 14, 2013; (4) Lieutenant David Brake ("Lieutenant Brake") of the Nash County Sheriff's Office, who responded to the third call at Defendant's residence on April 14, 2013; (5) Deputy George Lewis, Jr. ("Deputy Lewis"), formerly of the Nash County Sheriff's Office, who responded to the first and third calls at Defendant's residence on April 14, 2013 and spoke with Defendant in both Spanish and English; and (6) Deputy Matthew Joyner ("Deputy Joyner") of the Nash County Sheriff's Office, who responded to the third call at Defendant's residence on April 14, 2013 and collected the firearms discovered inside the residence. The Government also submitted five exhibits: a recording of the 911 call made by Defendant's daughter (Gov't Ex. 1), and photographs of the firearms that were discovered inside Defendant's residence and seized by the Nash County Sheriff's Office (Gov't Exs. 2-5). All exhibits were admitted without objection.

## II. STATEMENT OF THE FACTS

The following factual summary is taken from the testimony of all of the witnesses who testified at the suppression hearing and is offered to establish a timeline of the events that occurred

2

on April 14, 2013.

## A.     The First Call for Service

In the early morning hours of April 14, 2013, Deputies Marshmon and Lewis responded to a call for service reporting shots being fired in the general area of Defendant's residence. Hr'g Tr. [DE-56] at 6, 70-71. The deputies listened for gunfire, but did not hear any shots being fired and did not investigate further at that point. *Id.* One of the individuals who reported hearing gunfire was Larry Deans ("Deans"), Deputy Marshmon's first cousin. *Id.* at 13. Deans sent Deputy Marshmon a message around midnight, asking for help. *Id.* at 14. Deputy Marshmon testified that at first, he did not realize that Deans was referencing the events occurring at Defendant's residence. *Id.* Deputy Marshmon confirmed that he did not handle the call for service any differently than he normally would have even though his cousin was involved in placing the call. *Id.* at 20. As with any call reporting gunfire, Deputy Marshmon went to the scene to confirm whether shots were still being fired. *Id.* When he did not hear any gunfire, Deputy Marshmon left the scene. *Id.*

## B.     The Second Call for Service

Shortly after Deputies Marshmon and Lewis left Defendant's residence, another call reported shots being fired from Defendant's actual address, so Deputy Marshmon returned with Deputy Gelo and made contact with Defendant at his home. *Id.* at 6, 31, 33. Deputy Marshmon noticed shell casings on the front porch from a high-powered rifle and large holes in the ground consistent with a high-powered rifle being fired at close range as he approached Defendant's residence, and Defendant appeared to be intoxicated when he answered the door. *Id.* at 6-7. Deputy Marshmon did not perform any field sobriety tests on Defendant, but believed him to be intoxicated because Defendant smelled of alcohol, looked impaired, had glassy eyes, and was acting jolly. *Id.* at 16. Similarly, Deputy Gelo noticed that Defendant had been discharging his firearm based on fresh shell

3

casings in the yard that were sitting on top of the grass, and ruts caused by bullets entering the ground. *Id.* at 31-32. Deputy Gelo believed Defendant to be intoxicated based on his slurred speech, glassy eyes, and unsteadiness. *Id.* The deputies informed Defendant that law enforcement had received calls about shots being fired, and advised Defendant to stop shooting for the night because he was disturbing his neighbors. *Id.* at 7, 31, 33. Defendant smiled and said "okay, okay, okay," before going back into his house. *Id.* at 7. The officers spoke with Defendant in English, and Deputy Gelo believed that Defendant was understanding the conversation. *Id.* at 32. When asked to stop shooting for the night, Defendant appeared to be frustrated but was not combative. *Id.* At that point, the deputies were not going to arrest Defendant because he was not breaking any laws, but they impressed upon him the need to cease and desist since he was disturbing his neighbors, there were other mobile homes in the area within shooting distance, and because he should not be discharging a firearm while intoxicated. *Id.* at 33. There was no indication that Defendant was acting violently or aggressively, or was a threat to anyone's safety, other than the presence of the spent shell casings and his apparent intoxication. *Id.* at 22.

## C. The 911 Call and the Third Call for Service

The third call for service occurred in the early morning hours on April 14, 2013, after Defendant's daughter called 911 reporting a domestic dispute between her parents. *Id.* at 8, 71. Dispatcher Belcher received the 911 call from Defendant's daughter, and either he or one of his partners dispatched law enforcement to Defendant's residence. *Id.* at 26-27; Gov't Ex. 1 (audio recording of the 911 call). Deputy Marshmon arrived at the residence and the daughter informed him that Defendant had locked himself in his bedroom after stating "You may as well shoot me dead" and chambering a round to his rifle. Hr'g Tr. [DE-56] at 8. As Deputy Marshmon arrived at the residence, he noticed Defendant standing at a window on the far end of the mobile home with

4

a rifle in one hand, holding the curtain open and looking out. *Id.* at 8-9. On cross-examination, Deputy Marshmon admitted that he prepared an initial report and a supplemental report about the events at issue. *Id.* at 12. In the first report, Deputy Marshmon did not mention seeing Defendant standing in the window holding a firearm. *Id.* at 12-13. Deputy Marshmon also admitted he did not mention in either report the information from Defendant's daughter about Defendant chambering a round into his rifle before locking himself in the bedroom. *Id.* at 14-15. Defendant's daughter described the domestic violence situation that had occurred earlier that evening as Defendant striking his wife and either pushing her onto or pulling her off of a bed. *Id.* at 19.

Deputy Marshmon instructed Defendant's wife and the children to move to a safe distance, knowing that high-powered rifles were present and that Defendant had made a threat to himself. *Id.* at 8-9. Deputy Marshmon drove the wife and children in a van back to his police vehicle, and he activated his high-beam headlights and take-down lights so they could take cover behind the vehicle. *Id.* at 9. As Deputy Marshmon took cover, he could still see Defendant peeping out of the window holding the rifle. *Id.* Deputy Lewis spoke with Defendant's wife and children in both English and Spanish. *Id.* at 71-72. Deputy Lewis verified the information that had been relayed by Deputy Marshmon—that Defendant was standing in the window with a firearm and had been discharging his firearm earlier in the evening, and that deputies had already been called out to the residence that night. *Id.* at 72. Primarily, Deputy Lewis wanted to know whether anyone was in the mobile home aside from Defendant. *Id.* Defendant's wife told Deputy Lewis that no one else was in the home, and either the wife or the daughter gave Deputy Lewis a phone number to contact Defendant. *Id.* at 72-73. Deputy Lewis did not know whether it was a residential number or a cell phone number, but tried several times to reach Defendant on the phone without success. *Id.* at 73.

Lieutenant Brake, the shift supervisor on patrol that evening, also responded to the third call

5

at Defendant's residence. *Id.* at 51-52. Because the Nash County Sheriff's Office had already responded to two previous calls to Defendant's address, and since the third call came in towards the end of the shift and the situation appeared to be escalating, Lieutenant Brake responded as well. *Id.* at 52. When Lieutenant Brake arrived at Defendant's residence, other deputies were already on scene and Deputy Marshmon explained what they had learned about Defendant's mental state and his position in the window with a visible firearm. *Id.* Based on the totality of the circumstances, particularly the danger to nearby homes and to officers on scene, Lieutenant Brake decided to enter the residence and secure Defendant for the safety of himself and others. *Id.* at 53. Lieutenant Brake was especially concerned about Defendant's willingness to use the firearm and the assault on his wife, and the fact that Defendant would not communicate with officers on scene. *Id.* at 66-67. At that time, Lieutenant Brake believed Defendant was the only person inside the residence. *Id.* at 53.

None of the occupants asked the officers to enter the mobile home, and Lieutenant Brake did not seek permission from anyone to enter the home. *Id.* at 62-63. Instead, that decision was made by law enforcement. *Id.* at 63. Deputy Marshmon remained outside and Lieutenant Brake entered the residence, along with Deputies Gelo, Lewis, and Joyner. *Id.* at 11, 36, 42, 74-75, 85-87. Lieutenant Brake and Deputy Gelo were responsible for securing Defendant, while Deputy Lewis acted as the cover officer with his weapon drawn and Deputy Joyner acted as the rear guard, standing outside of Defendant's bedroom while the other three officers entered. *Id.* Once Lieutenant Brake authorized entry, the officers walked up to the front of the residence together. *Id.* at 53. The wooden door was open and the bedroom on the left was visible through the glass storm door. *Id.* at 53-54. Lieutenant Brake forced entry into the locked bedroom door by pushing it open, and observed Defendant on the bed with a rifle next to him. *Id.* at 54. As Lieutenant Brake was handcuffing Defendant, he noticed other firearms visible in the bedroom. *Id.* Deputy Gelo testified

6

that he was focused on Defendant, and did not notice any firearms inside the bedroom. *Id.* at 37. Deputy Lewis described seeing Defendant on the bed, appearing to be asleep with a long gun on the bed next to him as the officers entered the bedroom. *Id.* at 75. Deputy Lewis also remembered seeing another long gun and two handguns in plain view in Defendant's bedroom, which he identified as the weapons photographed in Government's Exhibits 2-5. *Id.* at 75-76. Deputy Gelo testified that upon entering the bedroom, he and Lieutenant Brake immediately took Defendant into custody and placed him in handcuffs behind his back. *Id.* at 36-37. According to Lieutenant Brake, the officers then brought Defendant outside, and as they were walking through the living room to the front door, they discovered two other small children inside the residence. *Id.* at 54. Deputy Gelo placed Defendant in the front seat of a patrol car outside of the residence. *Id.* at 37-38.

Lieutenant Brake stated that after discovering the children, he then instructed the officers to perform a protective sweep to ensure there were no additional people or weapons inside the residence. *Id.* at 54. According to Deputies Gelo and Lewis, however, the children were discovered during the course of carrying out the protective sweep, while the officers were making sure that no one else was in the residence and all weapons had been recovered. *Id.* at 47, 77-78. Four firearms were seized from Defendant's bedroom prior to the protective sweep, but Lieutenant Brake was not satisfied at that point that they had discovered all firearms in the home. *Id.* at 55-58; Gov't Exs. 2-5 (photographs of the four firearms seized from Defendant's bedroom). Deputy Joyner was responsible for seizing all four firearms, and testified that they were all in plain sight in Defendant's bedroom. Hr'g Tr. [DE-56] at 86-87. Lieutenant Brake testified that with small children coming back into the residence, he wanted to ensure no firearms were left unsecured and accessible to them. *Id.* at 59.

When the protective sweep was completed and the officers were preparing to leave, Deputy

7

Lewis spoke with Defendant while he was seated in the patrol vehicle. *Id.* at 78. Deputy Lewis did not advise Defendant of his *Miranda* rights and asked Defendant how many firearms he owned in order to verify that officers had found all firearms in the house since they knew children would be going back inside. *Id.* at 78-79. In response, Defendant admitted to owning four firearms. *Id.* at 79. Deputy Lewis also asked Defendant about his immigration status, and Defendant admitted that he was not a legal citizen. *Id.* Deputy Lewis is fluent in Spanish, and spoke with Defendant in both Spanish and English. *Id.* Deputy Lewis grew up speaking both English and Spanish and took a Spanish course in high school, but has not been accredited or tested in Spanish fluency at any point. *Id.* at 81-82. After the conversation with Deputy Lewis, Defendant was transported to the Magistrate's Office. *Id.* at 58.

## III. DISCUSSION

### A.    Defendant's Objection [DE-33]

The Government filed a Notice of Intent to Offer into Evidence Absence of a Public Record Pursuant to Federal Rules of Evidence 803(10) and 902(1), informing the court of its intention to offer a Certificate of Nonexistence of Record at trial in order to establish that no records have been found to indicate that Defendant lawfully entered the United States. [DE-27]. In response, Defendant filed an objection based on the date of the Certificate of Nonexistence of Record and the date of the offense at issue. [DE-33]. The Government responded to Defendant's objection, stating that in light of the objection, it would call an agent from the Department of Homeland Security to testify instead of offering the Certificate at trial. [DE-42].

At the hearing, counsel for the Government confirmed the Government's intention to introduce evidence via live testimony, and again stated that the Government did not intend to use the Certificate at trial. Hr'g Tr. [DE-56] at 24, 88. Accordingly, based on the Government's

8

representations to this court, the Notice of Intent [DE-27] is moot. *Id.* at 88. Given that the Notice of Intent is moot in light of the fact that the Government intends to produce a live witness at trial, the undersigned determines that Defendant's Objection [DE-33] is moot as well.

## B.    Defendant's Motions to Suppress [DE-35, -36]

Defendant has moved to suppress all evidence seized from his residence in Nash County, North Carolina on April 14, 2013, including but not limited to firearms and ammunition [DE-36] and all custodial statements made by Defendant on that date [DE-35]. Defendant asserts that suppression is required by the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution and *Miranda v. Arizona*, 384 U.S. 436 (1966). Specifically, Defendant argues that no exception to the warrant requirement existed to justify the entry into and search of Defendant's home; the police officers did not have consent or probable cause to enter the home; Defendant was questioned while in police custody in violation of his *Miranda* rights and did not waive those rights; and the threats, promises, and actions of the police officers rendered Defendant's statements involuntary for Fifth Amendment purposes. [DE-35, -36].

### i.    The Officers' Entry into Defendant's Home and Seizure of the Firearms

Defendant argues that the officers in this case violated his Fourth Amendment rights when they entered his home, detained him, and seized firearms without probable cause and without a warrant; failed to seek consent to enter Defendant's home; conducted an unlawful protective sweep before children were discovered in the home and after Defendant had been secured; and unlawfully seized firearms when they were not immediately recognizable as contraband or evidence of a crime. [DE-36, -61]. In response, the Government argues that the emergency aid exception justified the entry into Defendant's home where the officers believed Defendant to be suicidal and the officers were justified in seizing the firearms at issue. [DE-38, -57].

9

The Fourth Amendment guarantees the right of the people to be secure against unreasonable searches and seizures. U.S. Const. amend. IV. Because of the Fourth Amendment's protection, warrantless searches and seizures inside a home are presumptively unreasonable. *Groh v. Ramirez*, 540 U.S. 551, 559 (2004) (quoting *Payton v. New York*, 445 U.S. 573, 586 (1980)). Even so, "because the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions." *Brigham City v. Stuart*, 547 U.S. 398 (2006) (citing *Flippo v. West Virginia*, 528 U.S. 11, 13 (1999) (per curiam); *Katz v. United States*, 389 U.S. 347, 357 (1967)). Accordingly, "warrants are generally required to search a person's home or his person unless 'the exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Mincey v. Arizona*, 437 U.S. 385, 393-94 (1978) (internal quotations and citations omitted).

"One exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury. The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." *Stuart*, 547 U.S. at 403 (internal quotations and citations omitted). As such, "law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Id.* (citations omitted). The "emergency aid exception does not depend on the officers' subjective intent or the seriousness of any crime they are investigating when the emergency arises . . . . [i]t requires only an objectively reasonable basis for believing . . . that a person within [the house] is in need of immediate aid." *Michigan v. Fisher*, 558 U.S. 45, 47 (2009) (alteration and internal quotations omitted) (holding that the emergency aid exception applied where officers responded to a disturbance complaint and entered a home without a warrant after seeing a vehicle with a smashed front bumper in the driveway, damaged fenceposts, broken house

10

windows, blood on the hood of the vehicle, on clothes inside the vehicle, and on the door to the home, and could see an individual with a cut on his hand screaming and throwing things inside the home, who refused to answer the officers' inquiries about whether he needed medical attention); *see also Stuart*, 547 U.S. at 406-07 (holding that the emergency aid exception applied where officers entered a home without a warrant after responding to a noise complaint at 3:00 in the morning, heard an ongoing fight, and saw a juvenile being held back by several adults inside the home break free and punch an adult in the face, leaving the victim spitting blood).

Another exception to the warrant requirement is a protective sweep conducted pursuant to the standard laid out in *Maryland v. Buie*, 494 U.S. 325 (1990). *United States v. Jones*, 667 F.3d 477, 482 (4th Cir. 2012).

> When police officers make an arrest at a home, they are entitled to perform a further "protective sweep" of the house when they have "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene."

*United States v. Laudermilt*, 677 F.3d 605, 610 (4th Cir.), *cert. denied* 133 S. Ct. 458 (2012) (quoting *Buie*, 494 U.S. at 334). "The linchpin of the protective sweep analysis is not 'the threat posed by the arrestee, [but] the safety threat posed by the house, or more properly by unseen third parties in the house.'" *Jones*, 667 F.3d at 484 (quoting *Buie*, 494 U.S. at 336). In *Laudermilt*, officers responded to a 911 call after the caller reported Laudermilt was threatening the caller and her family with a gun and another family member had already placed three 911 calls relaying the same events. 677 F.3d at 608. The officers witnessed Laudermilt threatening the caller and her family, who were outside of the home, but did not see him with a gun. *Id.* Officers then secured Laudermilt when he left the residence and performed a protective sweep of the house. *Id.* Laudermilt informed officers that the only other person inside was his 14-year-old autistic brother,

11

although officers had received conflicting information about who was in the home. *Id.* at 608-09. During the sweep, the officers found the brother, who lead them to a rifle. *Id.* at 609. The court noted that "officers were responding to a potentially volatile situation involving a firearm and a domestic dispute," and after the officers had secured Laudermilt, the firearm was not accounted for and at least one other person was still in the home. *Id.* at 610. Ultimately, the court held that the protective sweep was warranted and the sweep need not have ended the moment the brother was secured. *Id.* at 611. The court also held that the seizure of the firearm was justified in order to ensure the safety of the child in the home. *Id.* at 612-13 (citing *United States v. Taylor*, 624 F.3d 626 (4th Cir. 2000)); *see also United States v. Black*, 153 F.3d 722, 1998 WL 416687 at *1-2 (4th Cir. 1998) (unpublished) (per curiam) (upholding the warrantless entry and search of a home for firearms where officers were responding to a domestic situation involving weapons and an officer was inside the home, not knowing how many people were inside, and "was faced with the presence of firearms that could have easily been removed or hidden, or possibly used against him or someone else.").

Similarly, the exigent circumstances exception permits a warrantless search of a home in certain situations where officers have probable cause to believe that contraband is present. *United States v. Moses*, 540 F.3d 263, 269-70 (4th Cir. 2008) (citations omitted). "Examples of exigent circumstances include a 'risk of danger to the police or to other persons inside or outside the dwelling[.]" *Id.* at 270 (quoting *Minnesota v. Olson*, 495 U.S. 91, 100 (1990) (internal quotation marks omitted)); *see also United States v. Battle*, No. 5:10-CR-103-H, 2010 WL 4828147, at *2-6 (E.D.N.C. Oct. 27, 2010) (unpublished) (applying the exigent circumstances exception where officers searched defendant's bedroom for a gun even though defendant had already been arrested and secured where defendant's wife and four children also lived in the home, "officers had reason

12

to believe that [d]efendant possessed a gun that was a potential threat to the officers and other occupants of the home," and the officers were also focused on "secur[ing] the safety of the public when there is a suspicion that contraband or firearms are present."), *adopted by* 2010 WL 4830147 (E.D.N.C. Nov. 22, 2010).

Here, officers responded to Defendant's home in the early morning hours of April 14, 2013. Officers had already responded to two reports of shots being fired from Defendant's home, had seen evidence that Defendant had recently been discharging his firearm, and observed Defendant and believed him to be intoxicated. Then at 5:14 a.m., Defendant's daughter called 911 reporting that her father had a gun in the house, her parents had been arguing, she was afraid something was going to happen, she was trying to keep her mother safe, her father had been drinking and was in his room with the gun, and she had been involved in a physical and verbal alteration with Defendant and her mother just before she called 911. Gov't Ex. 1. Once officers arrived on scene, the daughter reported that Defendant had locked himself in his bedroom after stating "You may as well shoot me dead" and chambering a round to his rifle. Deputy Marshmon could also see Defendant standing in a window of the residence, holding a rifle and looking out of the window. While Defendant argues that the undersigned should not credit this testimony because it conflicted with the initial and supplemental reports prepared by Deputy Marshmon, "it is the role of the district court to observe witnesses and weigh their credibility during a pre-trial motion to suppress." *United States v. Abu Ali*, 528 F.3d 210, 232 (4th Cir. 2008) (quoting *United States v. Murray*, 65 F.3d 1161, 1169 (4th Cir. 1995)). The undersigned determines, after hearing Deputy Marshmon's testimony and observing his demeanor on the stand during direct and cross-examination, that Deputy Marshmon is credible in his recollection of these events. The daughter also described the altercation between her parents as Defendant striking her mother and either pushing her onto or pulling her off of a bed.

13

Further, Deputy Lewis attempted to contact Defendant several times via telephone without success. Lieutenant Brake testified that he made the decision to enter the residence and secure Defendant based on the totality of the circumstances: (1) the danger to nearby homes and to officers on scene posed by Defendant's rifle, (2) Defendant's willingness to use the firearm, (3) Defendant's assault on his wife, (4) Defendant's refusal to communicate with officers on scene, and (5) Defendant's mental state and the possibility that he might harm himself.

Under these circumstances, the officers on scene had an objectively reasonable basis for believing that Defendant was "in need of immediate aid." *Fisher*, 558 U.S. at 47. Defendant had already been discharging his firearm that evening, was intoxicated, had gotten into a physical and verbal altercation with his wife and daughter, and had expressed the possibility of harming himself. Thus, the emergency aid exception permitted the officers to make a warrantless entry into the mobile home and secure Defendant so that he did not harm himself or others. *See id.* (applying the emergency aid exception where defendant refused to answer officers' inquiries about whether he needed medical attention and had a visible injury). Defendant's argument that the entry was unlawful based on the lack of consent is thus without merit, where the emergency aid exception applies to permit entry into the residence. However, alternatively, the Fourth Circuit has found implied consent under similar circumstances. *See United States v. Hylton*, 349 F.3d 781, 783 (4th Cir. 2003) (holding implied consent existed where a woman called 911 after an argument with defendant, reporting that he had a gun and would not let her into her apartment, stating that under the circumstances "it could be inferred that [the woman] gave the police authority to enter [her] apartment and retrieve the gun that caused her fear and apprehension."), *cert. denied* 541 U.S. 1065 (2004). Thus, the implied consent from Defendant's wife and daughter also permitted the officers' entry into the residence.

14

Once inside Defendant's bedroom, the officers seized four firearms. Gov't Exs. 2-5. While the officers did perform a protective sweep of the mobile home, the only firearms seized were discovered inside the bedroom with Defendant. Thus, the issue is whether the officers were justified in seizing those firearms. Defendant argues that the seizure was unlawful, as the firearms were not evidence of a crime or otherwise immediately apparent as contraband, and this case is distinguishable from *Laudermilt* in that the reports of domestic violence here did not involve a firearm. [DE-38, -57].

"[T]he plain-view doctrine authorizes warrantless seizures of incriminating evidence when (1) the officer is lawfully in a place from which the object may be plainly viewed; (2) the officer has a lawful right of access to the object itself; and (3) the object's incriminating character is immediately apparent." *United States v. Jackson*, 131 F.3d 1105, 1109 (4th Cir. 1997) (citing *Horton v. California*, 496 U.S. 128, 136-37 (1990); *United States v. Williams*, 41 F.3d 192, 196 (4th Cir. 1994)). As the Fourth Circuit has stated,

> Supreme Court cases and authority from other circuits explain that an item need not itself be contraband before it has an "incriminating nature," but instead, an item need only be evidence of a crime. *Texas v. Brown*, 460 U.S. 730, 742 (1983) (Rehnquist, J., plurality opinion) (discussing plain view doctrine and whether items may be "contraband or stolen property or *useful as evidence of a crime*") (emphasis added); *United States v. Smith*, 459 F.3d 1276, 1293 (11th Cir. 2006) ("the scope of the 'plain view' doctrine extends to the seizure of items that, while not contraband themselves, may be used as evidence against a defendant"); *United States v. Rodriguez*, 601 F.3d 402, 407 (5th Cir. 2010) ("The incriminating nature of an item is 'immediately apparent' if the officers have 'probable cause' to believe that the item is either *evidence of a crime* or contraband.") (emphasis added and citation omitted); *United Sates v. Chipps*, 410 F.3d 438, 443 (8th Cir. 2005) (warrantless seizure of a sweatshirt on the ground outside a house where there had been a reported assault was justified by the plain view doctrine, since 'the incriminating nature of a bloody sweatshirt at the site of a potential assault was obvious" and the officer "had a legal right to access the shirt—it was right in front of him on the ground"); *Chavis v. Wainwright*, 488 F.2d 1077, 1078 (5th Cir. 1973) (clothing in plastic hospital bag was properly seized from stabbing victim in hospital without a warrant as evidence of an assault, despite fact that victim told police he did not want to prosecute his

15

assailant girlfriend).

*United States v. Davis*, 690 F.3d 226, 236-37 (4th Cir. 2012) (some internal citations omitted) (holding that a plastic bag of bloody clothing was properly seized under the plain view doctrine from a shooting victim where it contained evidence of a crime even though defendant argued that the incriminating nature of the clothing was not immediately apparent), *cert. denied* 134 S. Ct. 52 (2013).

Here, multiple justifications exist for the officers' seizure of the firearms from Defendant's bedroom. Initially, Defendant's wife and daughter impliedly consented to the officers' entry into the home and removal of the firearms through the 911 call reporting the domestic disturbance, expressing fear about Defendant having a weapon, and their conversation with the officers outside the home. *See Hylton*, 349 F.3d at 783 (holding implied consent existed for officers to enter a home and search for a gun where a woman called 911 after arguing with defendant, reporting that he had a gun and would not let her into the apartment). Alternatively, as the officers were lawfully in Defendant's bedroom based on the emergency aid exception and the firearms were located in plain sight, the officers were justified in seizing the firearms as evidence of the domestic disturbance reported by the daughter and to ensure the safety of the children who would be returning to the home. *See Laudermilt*, 677 F.3d at 612-13 (upholding the seizure of a firearm to protect the safety of the child remaining in the home); *Black*, 1998 WL 416687 at *1-2 (upholding the warrantless entry and search of a home for firearms where an officer was inside the home and "was faced with the presence of firearms that could have easily been removed or hidden, or possibly used against him or someone else."); *Battle*, 2010 WL 4828147, at *2-6 (upholding the seizure of a gun where defendant's wife and four children also lived in the home, "officers had reason to believe that [d]efendant possessed a gun that was a potential threat to the officers and other occupants of the

16

home," and the officers were also focused on "secur[ing] the safety of the public when there is a suspicion that contraband or firearms are present.").

While Defendant argues that this case is distinguishable from *Laudermilt* because in that case, the domestic violence situation involved a gun, [DE-61] at 5-6, this argument is without merit where Defendant's daughter called 911, reporting an argument between herself and her parents, and expressing a fear about Defendant's possession of a firearm. Additionally, Defendant argues that the officers could have left the firearms in the possession of Defendant's wife, as she was a responsible adult who would have been returning to the home along with the children. *Id.* at 4-5. However, courts have upheld the seizure of weapons even when another adult would be returning to a home along with children. *See Battle*, 2010 WL 4828147, at \*2-6 (upholding the seizure of a gun where defendant's wife and four children also lived in the home). Thus, Defendant's arguments on this point are without merit. Accordingly, where officers were justified in entering Defendant's residence based on implied consent or the emergency aid exception to the warrant requirement and were justified in seizing the firearms based on implied consent, as evidence of a crime, or to ensure the safety of the children who would be returning to the home, it is recommended that Defendant's motion to suppress items seized from Defendant's residence [DE-36] be denied.

## ii. Defendant's Statements to Deputy Lewis

Defendant argues that he was questioned while in police custody in violation of his *Miranda* rights when he did not waive those rights, and the threats, promises, and actions of the police officers after they unlawfully seized him rendered Defendant's statements involuntary for Fifth Amendment purposes. [DE-35]. In response, the Government argues that the public safety exception applies to allow admission of Defendant's statement about ownership of firearms. [DE-39]. The Government concedes that the public safety exception does not apply to Defendant's

17

statement about his immigration status, and the Government will not introduce that statement at trial. *Id.* at 5 n.1, Hr'g Tr. [DE-56] at 93. Accordingly, it is recommended that Defendant's motion to suppress [DE-35] be denied as moot as to his statement about his immigration status.

The Fifth Amendment guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself[.]" U.S. Const. amend. V. To protect this right, the Supreme Court adopted in *Miranda v. Arizona*, 384 U.S. 436 (1966), several procedural rules governing custodial interrogations. *Id.* at 479. Prior to any questioning, a defendant must be warned "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him[.]." *Id.* Any statement elicited from a defendant in violation of these procedural rules is inadmissible in the prosecution's case-in-chief. *Oregon v. Elstad*, 470 U.S. 298, 307 (1985). However, the *Miranda* requirement is subject to the public safety exception. *New York v. Quarles*, 467 U.S. 649, 655-56 (1984). "Under the public safety exception to the *Miranda* requirement, an officer's questioning of a suspect before giving a *Miranda* warning is acceptable if it relates 'to an objectively reasonable need to protect the police or the public from any immediate danger associated with [a] weapon.'" *United States v. Young*, 58 F. App'x 980, 981-82 (4th Cir. 2003) (unpublished) (per curiam) (applying the public safety exception where an officer questioned defendant about weapons when police were executing a search warrant and had the defendant in handcuffs but could reasonably have believed other armed individuals were in the home) (citing *Quarles*, 467 U.S. at 659 n.8), *cert. denied* 540 U.S. 869 (2003); *see also Battle*, 2010 WL 4828147, at *2-6 (applying the public safety exception where an officer questioned defendant about weapons when police were executing an arrest warrant, even though the defendant was already secured where defendant's wife and four children also lived in the home, the entire home had not yet been secured, and officers

18

believed defendant had a firearm).

There is no question here that Defendant was in custody or subject to interrogation—the only issue for determination is whether the public safety exception applies to allow the admission of Defendant's statement that he owned four firearms in response to questioning by Deputy Lewis. Deputy Lewis testified that he asked Defendant how many firearms he owned, in order to ensure that officers had discovered all of the weapons before children were allowed to reenter the home. Defendant argued at the hearing, however, that Deputy Lewis's phrasing reveals that the officers were not concerned with finding weapons inside the residence, but instead were concerned about tying the firearms to Defendant, since Deputy Lewis inquired about ownership of firearms and not the number of weapons actually present inside the home. Despite the phrasing of the question "how many guns do you own," having heard Deputy Lewis's testimony and observing his demeanor on the stand during direct and cross-examination, the undersigned determines that Deputy Lewis is credible in his explanation that officers were trying to ensure that all weapons had been recovered from the home before the children were allowed back inside. *Abu Ali*, 528 F.2d at 232 ("it is the role of the district court to observe witnesses and weigh their credibility during a pre-trial motion to suppress."). Further, courts have applied the public safety exception to similar questioning about the location of weapons inside a residence even when defendants had already been secured. *See Young*, 58 F. App'x at 981-82; *Battle*, 2010 WL 4828147, at *2-6. Accordingly, here, Deputy Lewis's questioning related to "an objectively reasonable need to protect the police or the public from any immediate danger associated with [a] weapon," and the public safety exception applies to Defendant's statement about owning four firearms. *Young*, 58 F. App'x at 981-82. It is thus

19

recommended that Defendant's motion to suppress his statements [DE-35] be denied.[1]

## IV. CONCLUSION

For the reasons set forth above, the undersigned determines that Defendant's Objection [DE-33] is MOOT, and it is RECOMMENDED that Defendant's motions to suppress [DE-35, -36] be DENIED.

IT IS DIRECTED that a copy of this Memorandum and Recommendation be served on each of the parties or, if represented, their counsel. Each party shall have until **Friday, June 3, 2016** to file written objections to the Memorandum and Recommendation. The presiding district judge must conduct his or her own review (that is, make a de novo determination) of those portions of the Memorandum and Recommendation to which objection is properly made and may accept, reject, or modify the determinations in the Memorandum and Recommendation; receive further evidence; or return the matter to the magistrate judge with instructions. *See, e.g.*, 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3); Local Civ. R. 1.1 (permitting modification of deadlines specified in local rules), 72.4(b). Any response to objections shall be filed by within **14 days** of the filing of the objections.

**If a party does not file written objections to the Memorandum and Recommendation by the foregoing deadline, the party will be giving up the right to review of the Memorandum and Recommendation by the presiding district judge as described above, and the presiding district judge may enter an order or judgment based on the Memorandum and Recommendation without such review. In addition, the party's failure to file written objections by the foregoing deadline will bar the party from appealing to the Court of Appeals**

---

[1] In his motion, Defendant also argues that his statements were involuntary for Fifth Amendment purposes. [DE-35] at 1-2. This argument was not raised at the evidentiary hearing, but this argument is without merit where the officers' entry into the home was justified and there is no evidence that officers made any threats, promises, or inducements to Defendant at the time he made the statement about owning the four firearms. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 255 (1973) (Due Process requires that statements made by defendants to officers must be given voluntarily).

20

from an order or judgment of the presiding district judge based on the Memorandum and Recommendation. *See Wright v. Collins*, 766 F.2d 841, 846-47 (4th Cir. 1985).

SUBMITTED, the 20th day of May 2016.

Robert B. Jones, Jr.
United States Magistrate Judge